NOTE:  Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent.  It is a public record.

# United States Court of Appeals for the Federal Circuit

04-3261

JOHN R. BITARE,

Petitioner,

v.

DEPARTMENT OF JUSTICE,

Respondent.

_____

DECIDED:  January 31, 2006
_____

Before MICHEL, <u>Chief Judge</u>, BRYSON and GAJARSA, <u>Circuit Judges</u>.

MICHEL, <u>Chief Judge</u>.

John R. Bitare petitions for review of the December 30, 2002 initial decision of Administrative Judge ("AJ") LuNell C. Anderson upholding the February 10, 2001 decision of the Immigration and Naturalization Service ("INS") to terminate his employment as a Center Adjudications Officer ("CAO").  Docket No. SF-0752-01-0253-I-1.  The initial decision became the final decision of the Merit Systems Protection Board ("MSPB" or "Board") on February 27, 2004, when the full Board denied his petition for review.  Because the Board's decision to uphold Mr. Bitare's removal was unsupported by substantial evidence, particularly as to the findings of knowing mishandling of visa

petitions causing harm to the agency and discrimination among applicants, we <u>vacate</u> the removal and <u>remand</u> for further proceedings.

## I

In the fall of 1997, Mr. Bitare joined the INS as a Center Adjudications Officer ("CAO") at the California Service Center in Laguna Niguel ("Service Center"), a direct mail facility that processes applications for immigrant and non-immigrant visas. At the time of the incidents in question, Mr. Bitare worked in the family division, where he was responsible for adjudicating I-130 petitions, which involve sponsorship of an alien relative. The process for adjudicating I-130s is highly particularized. In the mailroom, INS contractors open and date-stamp incoming petitions; the date-stamp determines the order in which the petition will be processed and, in most cases, is also the petition's priority date, which determines the eligibility date for visa issuance.[1] A data entry operator ("DEO") then enters the petition into a tracking system.

The speed of petition adjudications depends on the Service Center workload. Each week, adjudication supervisors send a "Just in Time" ("JIT") report to all CAOs informing them of the receipt date currently being processed by the Service Center. Usually, a CAO sends an email to the contractor when he is prepared to adjudicate additional petitions, and a contractor employee delivers petitions to the CAO's workstation. The petitions are normally processed in the order received by the Service Center, and each I-130 is processed from start to finish by a single CAO. Once the alien is determined to be eligible for a visa, the adjudicated petition is held until its

---

[1] Although the initial date of receipt is generally the priority date, a petition may receive the benefit of an earlier priority date when, for example, a petition is granted a humanitarian waiver.

04-3261                                    2

priority date is reached. The priority date is "the chronological date which establishes the preferred place on a waiting list maintained by the Department of State for issuance of the immigrant visa." INS Adjudicator's Field Manual § 21.2(a)(3). In the case of a country where the number of eligible aliens exceeds the Department of State quota, such as the Philippines, approved petitions may remain on the waiting list for over ten years before the visa is issued.

On March 24, 2000, Mr. Bitare received a Notice of Proposed Removal for "non-compliance with standards, policies, regulations or instructions issued by the service." In support of this charge, the agency alleged that, on March 5, 1999, Mr. Bitare adjudicated a petition submitted by Juanita Eugenio Bantug on behalf of Benjamita Bantug Gamueda ("the Bantug petition") out of order. Mrs. Bantug's husband had previously filed an I-130 for their daughter still living in the Philippines, but he had passed away before the petition's priority date was reached. Per INS regulations, a petition is automatically revoked if the petitioner dies before the visa issues. Thus, Mrs. Bantug was required to file a new I-130 listing herself as sponsor. Mrs. Bantug's petition was date-stamped as received on January 13, 1999. On March 5, 1999, when Mr. Bitare processed the Bantug petition, the JIT report indicated that only I-130s received on or before December 23, 1997, were ripe for adjudication. As such, the agency alleged that Mr. Bitare processed the Bantug petition out of sequence and more than a year early.

However, the INS may agree not to revoke a petition filed by a decedent; in this case, the petition is granted a "humanitarian waiver". Mrs. Bantug submitted a request for humanitarian consideration with her I-130 application. A handwritten note on the top

of the Bantug petition said: "humanitarian consideration request old priority date: 09-01-86".  At the time of the incident, the visa priority date for aliens from the Philippines was 1986, meaning that only those I-130s with a priority date of 1986 or earlier would issue as visas.  As such, if the priority date on the Bantug petition was correct, immediate processing of the application would not have resulted in an "early" visa issuance.

The Notice of Proposed Removal stated that, as a junior officer, Mr. Bitare was not authorized to adjudicate "complex issues such as humanitarian consideration and alternative priority dates".  Rather, as the agency pointed out, "[p]etitions for humanitarian consideration are the responsibility of the supervisors".  The agency thus concluded that Mr. Bitare improperly gave the Bantug petition an earlier priority date.

The agency also alleged that, because the petitioner, Juanita Bantug, was the mother of CAO Germinigildo Bantug, Mr. Bitare "provided unfair discrimination" in favor of his colleague's family.  The agency stated that Mr. Bitare violated INS policy on "conflict of interest, prejudicial influence in administering the [INS] laws, and conspiracy."  As such, it concluded that Mr. Bitare's "wanton disregard for the law, and [ ] abuse of authority" warranted removal.

On August 16, 2000, the agency sent Mr. Bitare an Amended Notice of Proposal Removal which incorporated a recently-concluded Office of Internal Audit ("OIA") investigation and added a second specification of processing an I-130 petition out of order.  The second petition involved Ms. De La Cerna, a Filipino, and her husband, Scott Lauzon, an American ("the Lauzon petition").  At one time Ms. De La Cerna lived with Ofelia Waddell, an INS contractor who processed incoming applications at the Service Center and with whom Mr. Bitare was acquainted socially.  The Lauzon petition

was processed under Mr. Bitare's name on August 24, 1999, only six weeks after it was received by the Service Center.[2] At that time, the JIT report indicated that the family division was processing I-130s received in December 1997. Thus, the agency asserted that Mr. Bitare processed the Lauzon petition out of sequence and a year and a half early. As with the Bantug petition, the agency alleged that Mr. Bitare showed "preferential treatment to the applicant", this time on behalf of Ms. Waddell.

In a written reply submitted by his union representative, Mr. Bitare admitted to processing both petitions. However, he insisted that any wrongdoing was not "knowing" because on the Bantug petition, he acted at the direction of CAO Evelyn Beechamp, and on the Lauzon petition he, at worst, negligently failed to cross-reference the petition's receipt date with the JIT report.

Mr. Bitare testified that he twice refused Ms. Beechamp's request to adjudicate the Bantug petition, stating that he was "too busy" to assist her and that he was not trained in how to process complex adjudication cases. However, when Ms. Beechamp, whom he considered "a mentor", approached Mr. Bitare a third time and provided him

---

[2]    The Lauzon petition came to the attention of the OIA in a quite interesting way. The OIA found that Ms. Waddell "walked-through" the Lauzon petition in an attempt to process it outside of the normal INS channels. It appears that Ms. Waddell hand-carried the Lauzon petition in to the Service Center, and then asked a mailroom clerk to assemble it. The clerk's ID number appears on the Lauzon petition time/date stamp, but the clerk did not list the petition on his daily log. Next, Ms. Waddell hand-carried a stack of I-130 petitions to a fellow DEO and asked her to assign receipt numbers to the petitions. When the DEO stepped away from her workspace, witnesses reported seeing Ms. Waddell remove a file from the DEO's desk. When she was informed of this by her colleagues, the DEO cross-referenced the petition files and checks, and realized that she had an extra check, drawn on Ms. Waddell's personal account. Because she had written a receipt number on the check, the DEO was able to look up the missing file in the system and identify it as the Lauzon petition. The DEO and her colleagues immediately informed their supervisors, who began to monitor progress of the Lauzon file through the INS system. One week later, the Lauzon petition was processed under Mr. Bitare's name.

with a copy of the agency's Standard Operating Procedure ("SOP") for humanitarian waivers, he agreed to process the petition. Mr. Bitare testified that Ms. Beechamp informed him that the Bantug petition should be "grandfathered" based on its original priority date, and that he processed the petition as instructed.

With respect to the Lauzon petition, Mr. Bitare points out that the OIA report did not suggest that he engaged in any misconduct. Mr. Bitare did not deny that he processed the Lauzon petition, but stated that he focuses on adjudicating petitions rather than verifying that the contractor has delivered files in the proper order. He maintained that any early processing resulted from a failure to cross-reference the receipt date of the petition with the JIT report, which was negligent at worst.

Mr. Bitare's removal was made effective on February 10, 2001. In the removal letter, deciding official Dona Coultice stated that she had considered Mr. Bitare's reply. Ms. Coultice noted as mitigating factors Mr. Bitare's three years of service, performance rating of "Excellent", and lack of a disciplinary record. Nonetheless, she found removal to be warranted. The letter informed Mr. Bitare that his misconduct demonstrated a "serious lack of sound judgment[,] integrity and professionalism", all of which are required of a CAO.

Mr. Bitare appealed his dismissal to the MSPB, and the AJ affirmed the agency's decision on December 30, 2002. The AJ decision became the Final Decision on February 27, 2004, when the Board declined Mr. Bitare's petition for review. Mr. Bitare timely appealed to this court, which has jurisdiction under 5 U.S.C. § 7703(c)(1).

**II**

This court may set aside an agency action only if it is: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c).

On appeal, Mr. Bitare does not dispute the veracity of the charge against him. Rather, he argues that the AJ's finding that he "knowingly" processed the petitions out of order and too early is unsupported by substantial evidence. He asserts that his mistakes were honest, unintentional, and not committed for any personal or pecuniary gain. We examine the evidence of intentionality for each petition separately.

**A. The Bantug Petition**

The AJ determined that Mr. Bitare knowingly adjudicated the Bantug petition out of order and likewise knew that his approval of an earlier priority date was improper. She based this conclusion on her finding that Mr. Bitare's testimony was "inherently improbable" and "unworthy of belief". However, the AJ's conclusion regarding Mr. Bitare's credibility was based upon a flawed analysis of his testimony. Because Mr. Bitare referred to the petition as a "reconstruction", the AJ evaluated whether Mr. Bitare could have believed that the Bantug petition was a reconstruction petition, without considering whether it could have been a humanitarian waiver, as Ms. Beechamp, the more senior CAO experienced in complex adjudications, stated in her deposition.

The two types of petitions are quite different. In a reconstruction petition, the original applicant resubmits a petition that was lost during the course of INS processing. In a humanitarian waiver, on the other hand, a new applicant requests the benefit of a

previous applicant's priority date. The AJ noted that "even a cursory review of the petition clearly indicat[ed] that this was the first petition filed by Josefina Bantug on behalf of her daughter" because Ms. Bantug had answered "no" to the question of whether she had ever previously filed an I-130 petition. Likewise, the AJ stated that the priority date of September 1, 1986, "could not possibly be valid even for a reconstructed application because the petitioner did not become a United States citizen through naturalization until March 21, 1997." While this evidence certainly indicates that the application was not a reconstruction petition, this information is consistent with a request for humanitarian waiver--in which a new applicant files a petition requesting the priority date of a prior applicant. Moreover, regardless of the type of petition at issue, Mr. Bitare's fundamental contention remained consistent throughout his testimony: he had no experience in complex adjudications, and took for granted that the priority date already indicated on the petition was correct. As such, the evidence does not support the AJ's conclusion that Mr. Bitare's testimony on this point was "inherently improbable".

The agency alleged that Mr. Bitare provided "unfair discrimination" for co-worker Gil Bantug, but did not submit any evidence to establish that Mr. Bitare was aware that the Bantug petition involved family members of his colleague at the time he processed the petition. Indeed, Mr. Bitare denied having such knowledge at the Board hearing. The AJ cited Mr. Bitare's November 3, 2000 reply to the Notice of Proposed Removal, in which the union representative stated that Ms. Beechamp had asked Mr. Bitare to adjudicate an I-130 petition involving a co-worker, as evidence of Mr. Bitare's knowledge. This conclusion does not follow logically from the statement. At the time he prepared his response to the Amended Notice of Proposed Removal, Mr. Bitare was

well aware that the Bantug petition involved family members of his colleague. Mr. Bitare's statement to that effect one-and-a-half years after the petition was processed falls far short of proving his knowledge at the time.[3] Although Mr. Bitare acknowledged that INS instructions required him to bring the petition of a Service Center relative to a supervisor's attention, and admitted that he did not do so, the more reasonable inference from this concession is that he did not do so <u>because he was unaware that the rules applied to this petition</u>, not that he knowingly violated the rules.

Thus, we are left with Mr. Bitare's testimony that the notation regarding humanitarian consideration was not on the Bantug petition when he processed it. The AJ stated that, from this testimony, "an inference can certainly be drawn that the appellant knew his adjudication of this petition was out of order and that his approval of the priority date was improper". This inference, too, is flawed. It is undisputed that the priority date of September 1, 1986, was already on the Bantug petition when Mr. Bitare received it. Moreover, the agency conceded in an interrogatory that Mr. Bitare did not determine this earlier priority date. Nor does a CAO "approve" a priority date if it is already noted on a petition he processes. Thus, the absence of the written words "humanitarian consideration request granted" does not demonstrate impropriety at the time of processing.

The remaining facts are as follows: Mr. Bitare testified that Ms. Beechamp, whom he considered "a mentor", asked him to adjudicate the petition, which she denies;

---

[3]    It is worth noting that in Ms. Beechamp's MSPB appeal, involving a petition for a second sister of Gil Bantug, the AJ <u>did not sustain</u> the agency's allegation that she knowingly processed a petition involving a co-worker because, as here, the agency supplied no evidence that Ms. Beechamp knew the petitioner was related to Gil Bantug at the time she processed the petition. <u>Beechamp v. Dep't of Justice</u>, Docket No. SF-0752-00-0641-I-1 (Dec. 29, 2000).

however, she does acknowledge writing "humanitarian consideration request granted" on a petition involving a second sister of Gil Bantug, in handwriting that appears remarkably similar to the notation on the Bantug petition at issue here.[4] In her deposition, Ms. Beechamp admitted giving Mr. Bitare the agency's SOP for humanitarian waivers. Although Ms. Beechamp had recently been transferred to the employment division, Mr. Bitare reasonably could have believed that Ms. Beechamp was responsible for the Bantug I-130 because a single CAO retains responsibility for a petition from start to finish, even if transferred between divisions. Thus, if Mr. Bitare believed that the priority date on the petition was correct,[5] then his subsequent processing of the petition using that priority date would not have been improper. As such, we reverse the AJ's findings that Mr. Bitare knowingly adjudicated the Bantug petition out of order and wrongly approved the earlier priority date as unsupported by substantial evidence.

Mr. Bitare argues that he was treated disparately from Ms. Beechamp for a similar infraction. Ms. Beechamp, who admitted to granting improperly a humanitarian waiver for the second Bantug petition, ultimately received a 30-day suspension for her actions. The AJ in Ms. Beechamp's MSPB appeal did not sustain the agency's

---

[4]    The AJ also seemed to imply that because Mr. Bitare knew that two other employees had refused to process the petition, he knew that the petition was improper. However, no inference can be drawn from this fact because Mr. Bitare testified that he did not know why the other two CAOs refused to process the Bantug petition, and the agency did not present any evidence on this issue.

[5]    The AJ stated that the appellant received training in I-130 petitions just prior to his alleged misconduct in this case. However, as the agency noted in its Notice of Proposed Removal, "petitions for humanitarian consideration are the responsibility of the supervisors" and there is no evidence that Mr. Bitare had received training in this type of complex adjudication.

allegation that Ms. Beechamp knew the Bantug petitioner was related to Gil Bantug at the time she processed the petition, Beechamp v. Dep't of Justice, Docket No. SF-0752-00-0641-I-1 (Dec. 29, 2000), and we have found a similar lack of proof here. As such, on remand, we instruct the AJ to reevaluate Mr. Bitare's claim of disparate treatment as compared to Ms. Beechamp.

## B. The Lauzon Petition

The AJ also found Mr. Bitare's testimony that he did not recall approving the Lauzon I-130 petition to lack credibility. First, the AJ pointed to Mr. Bitare's prior processing of the Lauzon I-129F (a petition on behalf of a fiancée).[6] Second, the AJ stated that Mr. Bitare offered "conflicting explanations" as to how the Lauzon petition may have been adjudicated out of order. We agree with the AJ that it seems curious that Mr. Bitare would not recall an I-130 when he had previously processed an I-129F for the same petitioner. However, the agency did not rebut Mr. Bitare's testimony that, because he processed such a large number of petitions--as many as eighty per day--he rarely recalled any individual petition.

Moreover, we find Mr. Bitare's alternative explanations to be entirely consistent with his claim of lacking recollection. Mr. Bitare merely offered two scenarios in which the petition may have been processed. First, Mr. Bitare suggested that because his stamp was not on the petition, which he characterized as "very odd", a colleague may have approved the petition under Mr. Bitare's login when he stepped away from his desk. In the alternative, Mr. Bitare speculated that someone may have planted the

---

[6] Mr. Lauzon submitted an I-129F petition for his fiancée before they were married. Mr. Bitare processed this petition four days later, which he admits is unusually fast; he was unable to offer any justification for this expedited processing.

petition in his in-basket out of order, and that he then proceeded to adjudicate the petition unknowingly. Indeed, the reasonable inferences surrounding the OIA investigation of the Lauzon petition seem to support this latter hypothesis. The OIA found that Ms. Waddell had acted surreptitiously in attempting to process the Lauzon petition outside of normal processing channels, and had slipped the Lauzon petition to a DEO who unknowingly assigned it a receipt number in the course of her normal duties. This evidence certainly supports Mr. Bitare's suggestion that someone (i.e. Ms. Waddell) may have placed the petition in his in-basket without his knowledge. Ms. Waddell, of course, would have had a motivation to do so as she was a close friend of Lauzon's. In contrast, the agency conceded in an interrogatory that Mr. Bitare did not know Mr. Lauzon.

Mr. Bitare admits that he knew and socialized with Ms. Waddell. Although the agency alleged that Mr. Bitare showed "preferential treatment to the applicant" for the benefit of Ms. Waddell, the agency did not submit any evidence that Mr. Bitare had conspired with Ms. Waddell or, indeed, that he had even spoken with her on the days surrounding the processing of the Lauzon petition. In short, there was no reasonable basis from which to infer that Mr. Bitare was aware of Ms. Waddell's actions. As such, we overturn the finding that Mr. Bitare "knowingly" processed the Lauzon petition out of order as unsupported by substantial evidence.

## C. Nexus

Given this court's legal conclusion that substantial evidence does not support the AJ's finding that Mr. Bitare's actions were knowing, the AJ's finding of a nexus between Mr. Bitare's wrongdoing and the efficiency of the service must be vacated as well.

04-3261                                    12

Because the agency failed to establish that Mr. Bitare's actions were dishonest, the AJ erred in relying on a "presumption of nexus" in the "dishonesty implicit" in Mr. Bitare's actions. See Miles v. Defense Contract Audit Agency, 12 M.S.P.R. 416, 417 (1982).

Likewise, the AJ's finding that Mr. Bitare's actions "depriv[ed], or at least delay[ed]" the right of entry to an "immigrant who was entitled to enter the United States" is unsupported by substantial evidence. There are at least two defects in the AJ's reasoning. First, no showing was made that the applicants were not entitled to a visa, and second, the agency failed to submit any evidence showing that Mr. Bitare's actions caused a visa to be issued early. Because the priority date is generally the same as the receipt date-stamp, and is assigned in the mailroom before a petition reaches a CAO, it does not appear that early adjudication of the Lauzon petition led to early visa issuance. Indeed, it seems that the Lauzon petition, once approved, would then sit for many years on the waiting list until its priority date was reached.[7] Similarly, as explained above, if Mr. Bitare was justified in believing that the Bantug petition had been granted a humanitarian waiver, then his adjudication would not have resulted in an "early" visa issuance. Assuming the grant was improper, any harm to the agency would have been inflicted by the individual who granted the humanitarian waiver, not by Mr. Bitare.

As such, on remand, we instruct the AJ to reevaluate evidence of any harm to the agency and to evaluate anew whether the agency has established a nexus between

---

[7]     In this situation, any "unfair discrimination" to the applicant would be limited to the applicant's mental benefit from learning prematurely that his petition was approved; the corresponding harm to applicants ahead of Lauzon would be limited to learning, at most, one day later that their petitions had been approved or denied. Again, the visa issuance date would not be affected.

Mr. Bitare's actions and the efficiency of the service independent of dishonesty on the part of Mr. Bitare. To meet this burden, the agency must establish that there is "a clear and direct relationship between the articulated grounds for an adverse action and either the employee's ability to accomplish his or her duties satisfactorily or some other legitimate government interest." Hatfield v. Dep't of Interior, 28 M.S.P.R. 673, 674 (1985).

We note that the evidence may support an inference in favor of Mr. Bitare on this issue. Although the petitions were processed in March and August of 1999, Mr. Bitare did not receive the Notices of Proposed Removal until March and August of 2000. Then, although Mr. Bitare submitted his reply on November 3, 2000, the agency did not decide to remove Mr. Bitare until the following February. Rather than suspending him, the agency chose to have him continue adjudicating petitions. In addition, Ms. Coultice, the deciding official, declined Mr. Bitare's offer to cease processing Filipino petitions pending a final determination by the agency, stating that "from management's perspective, there is no conflict of interest in the cases you have been given to adjudicate." Thus, the agency seemingly conceded that the infractions did not affect Mr. Bitare's ability to accomplish his duties satisfactorily. Without explanation, the agency delayed almost two years from the first incident before removing Mr. Bitare. The lack of urgency with which the agency acted and the agency's express statement declining to restrict Mr. Bitare's duties certainly undermine the agency's subsequent claim that Mr. Bitare's conduct demonstrated "a serious lack of sound judgment[,] integrity and professionalism."

**III**

In sum, the agency failed to carry its burden of proof with respect to both the intentionality of Mr. Bitare's actions and harm to the INS or any applicant. As such, we overturn the AJ's finding that Mr. Bitare "knowingly" provided "unfair discrimination" with respect to the Bantug and Lauzon petitions as unsupported by substantial evidence. We thus vacate the AJ decision upholding Mr. Bitare's removal and remand this case to the AJ for further proceedings consistent with this opinion, including a new analysis of nexus, excluding reliance on a presumption of nexus based on dishonesty.